UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
CHRISTOPHER G. PITT, SR., et al.,   )
                                    )
        Plaintiffs,                 )
                                    )
        v.                          )   Civil Action No. 01-2225 (PLF)
                                    )
DISTRICT OF COLUMBIA, et al.,       )
                                    )
        Defendants.                 )
_____ )

OPINION

This matter is before the Court following a remand for further proceedings from the court of appeals. See Pitt v. District of Columbia, 491 F.3d 494 (D.C. Cir. 2007). The court of appeals stated that on remand, "the district court must determine whether the three officers' actions in arresting Mr. Pitt 'violate[d] clearly established constitutional rights of which a reasonable person would have known.'" Id. at 510 (brackets in original) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).

I. BACKGROUND

The Court will repeat the factual background of this case as described by the court of appeals. See Pitt v. District of Columbia, 491 F.3d at 498-500.

> At approximately 12:00 p.m. on January 2, 2001, two senior citizens -- Henry and Gloria Feldman -- were violently robbed in their apartment building in Northwest Washington. The robber had followed the Feldmans into their building and then into the elevator. In the hallway outside the Feldmans' apartment, the robber "socked" Mr. Feldman in the face and took his wallet, then grabbed Mrs. Feldman's purse before escaping down a nearby

staircase. The Feldmans immediately called 911. During the 911 call, Mrs. Feldman described the robber as a black man around 5'8" tall with a medium complexion and dark hair, who was wearing a black leather jacket and a "beige-y" shirt. She told the operator that the perpetrator had not used a weapon during the robbery.

Meanwhile, Keith Dade, an employee of the apartment building, was notified of the robbery and saw the perpetrator leaving the building. Mr. Dade followed the man and attempted to ask him a few questions, but the robber told Mr. Dade to "back up" and started to run away. Mr. Dade saw the robber make a suspicious "gesture" as though he might have had a weapon, but did not actually see a weapon. After following the perpetrator out of the building and across the street, Mr. Dade lost sight of him. Mr. Dade gave a description of the robber to the police, who subsequently broadcast a lookout alert to officers in the area.

Responding to the lookout alert, Officers Bryan Adams and Steven Baxter arrived at the intersection where Mr. Dade last saw the perpetrator. After conferring with other officers at the scene, Officer Adams looked down the street and saw an individual who matched the description of the perpetrator get into a car and begin driving toward Rock Creek Park. The individual spotted by Officer Adams was the plaintiff, Christopher Pitt. Officers Adams and Baxter returned to their vehicle and followed plaintiff through Rock Creek Park and onto Calvert Street before pulling him over on the Taft Bridge on Connecticut Avenue. During the officers' pursuit, plaintiff failed to fully stop at some of the stop signs, but he was not speeding. After stopping the plaintiff, the officers told him that he was a suspect in a robbery, asked him to step out of the vehicle, and handcuffed him for their protection. The officers confirmed that plaintiff's clothes and physical characteristics matched the description of the robber. Plaintiff permitted the officers to search his vehicle, and during this search they found a hunting knife and a BB gun. Mr. Pitt informed the officers that he worked as a courier, and that the knife and BB gun were for his protection. Plaintiff also provided the police with a list of the pickups and deliveries he had made that day, as well as two receipts for recent deliveries to the embassies of Kuwait and Qatar.

After being notified that a suspect had been apprehended, other police officers brought the Feldmans and Mr. Dade to the

Taft Bridge for a "show-up" identification to determine whether any of the eyewitnesses could identify plaintiff as the robber. Mrs. Feldman told the officers she got a "good look" at the robber, and that she was "certain" plaintiff was not the person who had robbed them. Mr. Feldman told the police he "wasn't sure" whether plaintiff was the perpetrator, but that he "doesn't think so." Mr. Dade thought plaintiff looked somewhat like the robber, but he "couldn't make a positive ID" because the plaintiff's hair was "longer and curlier" than the robber's, and the plaintiff -- unlike the robber -- was wearing a hat.

Lieutenant Josiah Eaves was at the Feldmans' apartment building reviewing the building's security videotapes when he heard over the radio that a suspect had been arrested. Surveillance cameras had captured the robber's image as he entered the building behind the Feldmans. Lt. Eaves went to the Taft Bridge to determine whether plaintiff was the person seen on the tapes. Lt. Eaves told the officers on the scene that he was confident plaintiff was the robber.

While the show-up identification was being conducted, two other officers -- Detectives Sean Caine and James Bovino -- conducted a brief investigation of plaintiff's alibi that he was making deliveries at a nearby embassy at the time of the robbery. The two detectives questioned a guard at the Kuwaiti Embassy about whether plaintiff had been there earlier that day, but the details of this interaction are disputed. Detective Caine testified at trial that the guard told him that "he hasn't seen Chris today." However, the embassy guard testified that he told the officers that a "Chris" had been at the embassy on the day of the robbery.

After the show-up, Mr. Pitt was arrested and taken into custody. The next day, Officers Adams and Baxter presented the case to screening prosecutors from the U.S. Attorney's Office. Officer Adams gave the prosecutors an affidavit that contained a detailed description of the robbery, but did not mention the negative identifications or Mr. Pitt's alibi. It is disputed whether the officers' handwritten notes -- which did describe the negative identification and alibi -- were given to the screening prosecutors along with the affidavit. The affidavit also stated that a cell phone ear piece cover was found at the scene of the robbery, and that Mr. Pitt's cell phone ear piece was "missing its cover."

>Based on the information contained in this affidavit, on January 3, 2001, a Superior Court Magistrate Judge ordered Mr. Pitt committed to a halfway house. Mr. Pitt spent ten days incarcerated before being released on January 13, 2001. Six days later, the government dismissed the criminal case against Mr. Pitt.

Pitt v. District of Columbia, 491 F.3d at 498-500.

The jury found for Mr. Pitt on his claim of false arrest under 42 U.S.C. § 1983. The undersigned thereafter granted the individual officers' motion for judgment as a matter of law on this claim under Rule 50 of the Federal Rules of Civil Procedure, see Pitt v. District of Columbia, 404 F. Supp. 2d 351, 356 (D.D.C. 2005), "holding that the officers were entitled to qualified immunity. . . ." Pitt v. District of Columbia, 491 F.3d at 500. As the court of appeals explained, "[i]n reaching this conclusion, the district court relied in part upon the jury verdict on the common law claims, in which the jury found that the officers were not liable for false arrest because they had a reasonable good faith belief that their conduct was lawful." Id. The court of appeals held that it was error for the Court to "consider[] the jury verdict from the common law false arrest claims in [a] qualified immunity analysis." Id. at 509.[1] The issue on remand is whether Officers Adams and Baxter and Detective Bovino are entitled to qualified immunity with respect to Mr. Pitt's claim of false arrest under 42 U.S.C. § 1983. As explained above, "the district court must determine whether the three officers' actions in arresting Mr. Pitt 'violate[d]

---

[1] With respect to the common law false arrest claim, the jury was specifically asked whether despite the finding of an arrest without probable cause, it nevertheless found that the officers acted reasonably and in good faith, to which the jury answered in the affirmative. At the urging of the defendants, no such question was put to the jury with respect to the Section 1983 claim.

clearly established constitutional rights of which a reasonable person would have known.'" Id. at 510 (brackets in original) (quoting Harlow v. Fitzgerald, 457 U.S. at 818).[2]

## II.  DISCUSSION

### *A.  Rule 50(b) Standard*

After a jury trial, the Court may grant a motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure only if it finds that "a reasonable jury would not have had a legally sufficient evidentiary basis to find for the party on that issue[.]" FED. R. CIV. P. 50(a)(1).  Judgment as a matter of law is proper, "considering the evidence in the light most favorable to the [Pitts, as the non-movants] and making all reasonable inferences in their favor," if the Court concludes that there is no legally sufficient evidentiary basis for a reasonable jury to have found in their favor under controlling law.  Hendry v. Pelland, 73 F.3d 397, 400 (D.C. Cir. 1996); see Fox v. District of Columbia, 990 F. Supp. 13, 19 (D.D.C. 1997). The jury's verdict must stand "unless the evidence, together with all inferences that can be reasonably drawn therefrom is so one-sided [in favor of the moving party] that reasonable persons could not disagree on the verdict," Milone v. Washington Metropolitan Area Transit Authority, 91 F.3d 229, 231 (D.C. Cir. 1996), that is, unless the non-movant's evidence is so insufficient that a reasonable finder of fact "could not possibly find for the non-movant."  9 MOORE'S FEDERAL PRACTICE § 50.60[1] at 50-87 (3d ed. 2002).

---

[2]  The supplemental briefs filed by the parties include: Defendants' Supplemental Memorandum in Support of Qualified Immunity("Defs' Supp."); Plaintiffs' Response to Defendants' Renewed Rule 50(b) Motion on Qualified Immunity ("Pl's Resp."); Defendants' Reply to Plaintiff's Response to Defendants' Supplemental Memorandum in Support of Qualified Immunity ("Defs' Reply").

In deciding a motion for judgment as a matter of law, the Court is not to resolve legitimately disputed issues of fact already decided by the jury. 9 MOORE'S FEDERAL PRACTICE § 50.60[1] at 50-87 (3d ed. 2002). Even if the Court finds the evidence that led to the jury verdict unpersuasive, or that it would have reached a different result if it were sitting as the fact-finder, that is not a basis for overturning the jury's verdict and granting judgment as a matter of law. Id. The Court may not grant the motion unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Me, Inc. v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998).

As the Supreme Court has explained, at the Rule 50 stage, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 151 (2000) (internal quotations and citations omitted).

### B. Qualified Immunity

The individual defendants named in this case are Officers Bryan Adams and Steven Baxter, and Detective James Bovino. On Count I, charging a violation of civil rights under 42 U.S.C. § 1983, the jury was asked a single question with respect to each of the individual defendants: "Do you find by a preponderance of the evidence that [the defendant]

intentionally committed acts that violated the constitutional right of plaintiff Christopher G. Pitt, Sr., not to be arrested without probable cause?" With respect to each defendant, the jury answered "Yes."

The question for the Court to answer is whether the defendants are entitled to qualified immunity. As the court of appeals noted:

> The Supreme Court has held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Wilson v. Layne, 526 U.S. 603, 614 (1999) (holding that qualified immunity turns upon the "objective legal reasonableness of the officers' action, assessed in light of the legal rules that were clearly established at the time the action was taken" (internal quotation marks and citation omitted)).

Pitt v. District of Columbia, 491 F.3d at 509. A defendant's entitlement to qualified immunity is a question of law to be decided by the Court. See id. "Whether an official protected by qualified immunity may be held personally liable . . . generally turns on the objective legal reasonableness of the action." Wilson v. Layne, 526 U.S. at 614. In assessing whether a party is entitled to qualified immunity, the facts must be taken in the light most favorable to the party asserting the constitutional injury. See Saucier v. Katz, 533 U.S. 194, 201 (2001) (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)); see also Scott v. Harris, 127 S.Ct. 1769, 1774 (2007).

In engaging in a qualified immunity analysis, the Court "must determine whether a constitutional right has been violated *before* moving to the analysis of whether a right was 'clearly established' at the time of the defendant's actions." Pitt v. District of Columbia, 491 F.3d at 511 n.3 (emphasis in original) (citing County of Sacramento v. Lewis, 523 U.S. 833, 841

n.5 (1998) and Barham v. Ramsey, 434 F.3d 565, 572 (D.C. Cir. 2006)). In this case, the violation of Mr. Pitt's rights was found by the jury and remains undisturbed by this Court and by the court of appeals. The sole question on remand is "whether the three officers' actions in arresting Mr. Pitt 'violate[d] clearly established constitutional rights of which a reasonable person would have known.'" Pitt v. District of Columbia, 491 F.3d at 510 (brackets in original) (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Another formulation of this standard is this: "whether an objectively reasonable officer would have believed his conduct to be lawful, in light of clearly established law[.]" Id. at 509-10.

*C. Analysis*

As a preliminary matter, the Court emphatically declines the defendants' suggestion that the "Court should still be 'logically guided' in its qualified immunity analysis 'by the jury's determination that the arrest had a reasonable basis under common law.'" Defs' Supp. at 2. It is precisely because of the Court's consideration of the jury's verdict on the common law false arrest claim, in the context of its original Section 1983 qualified immunity analysis, that the court of appeals reversed and remanded on this issue. See Pitt v. District of Columbia, 491 F.3d at 509.

> The defendants next argue that
>
> the proper qualified immunity inquiry can be framed as follows: "Whether probable cause existed to arrest, where the suspect's clothing and physical description matched the lookout, the suspect was seen taking the expected escape route and leaving the area where the attacker was last seen minutes earlier, and the suspect possessed the instruments of robbery, including a knife believed used in the attack?"

Defs' Supp. at 6. This is not a proper framing of the question, for a number of reasons. First, it has already been determined that there was not probable cause to arrest Mr. Pitt. See Pitt v. District of Columbia, 404 F. Supp. 2d at 354. Accordingly, the question is better phrased like this: "whether an objectively reasonable officer would have believed his conduct to be lawful, in light of clearly established law[.]" Pitt v. District of Columbia, 491 F.3d at 509-10. Defendants themselves admit this in their reply brief. See Defs' Reply at 1 (the inquiry on remand is "whether a reasonable officer could have believed, albeit mistakenly, that probable cause existed at the time under the particular circumstances he confronted"). Second, the defendants failed to take account of the proper legal standard. Because Mr. Pitt is the non-movant, the Court must consider the evidence in the light most favorable to him, and make all reasonable factual inferences in his favor – *not* in the defendants' favor. See supra at 5-6.

The factors that defendants Adams and Baxter cite in support of their argument that objectively reasonable officers in their situation could have believed, albeit mistakenly, their conduct to be lawful include: matching physical description and clothing, proximity in time and location, use of expected escape route, possession of instruments of robbery, and Officers Adams and Baxter's asserted reliance on instructions to arrest received from a superior officer, Lieutenant Lanciano. See Defs' Supp. at 6-8.[3] Plaintiff is correct when he points out that several of these factors were already discussed, and rejected, by the court of appeals in its decision. See Pl's Resp. at 2.

---

[3] Although the Court agrees with plaintiff, see Pl's Resp. at 4, that the defendants' opening supplemental brief can be read otherwise, defendants admit in their reply brief that they are not arguing that Officers Adams and Baxter are not responsible for arresting Mr. Pitt. See Defs' Reply at 1.

Regarding the supposed match of physical description and clothing between Mr. Pitt and the robber, the court appeals noted that "this fact has little probative value, given that the persons who provided these descriptions – Mr. and Mrs. Feldman – both provided negative identifications of Mr. Pitt during the show-up identification." Pitt v. District of Columbia, 491 F.3d at 503. The court of appeals made this observation during its discussion of Mr. Pitt's common law malicious prosecution claims; if there is evidence in the record to support the factual finding that Officers Adams and Baxter were aware of the negative identification before they arrested Mr. Pitt, however, it would be equally as relevant to Mr. Pitt's false arrest claim under Section 1983.

Defendants point to some evidence in the record to support the assertion that Officers Adams and Baxter were not aware of the results of the show-up identification until some time after they arrested Mr. Pitt on the Taft Bridge. See Defs' Supp. at 10 (citing Exh. B, Tr. 8/19/03 at 43; Exh. C, Tr. 8/21/03 at 23). An examination of the cited exhibits, however, reveals that they contain transcripts of the trial testimony of defendants Adams and Baxter themselves. As noted above, "the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from *disinterested* witnesses." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. at 151 (emphasis added). This testimony – the only evidence defendants cite to support the assertion that Officers Adams and Baxter were not aware of the negative identification of Mr. Pitt when they arrested him – is evidence favoring the movants, not the nonmovant, and is far from uncontradicted, unimpeached, or coming from disinterested witnesses.

Plaintiff argues, see Pl's Resp. at 8-11 & n.2, and the Court agrees, that the Court need not accept this assertion by the defendants, and should not infer that Officers Adams and Baxter were unaware at the time of the arrest of the negative identification resulting from the show-up. Defendants' self-interested testimony, standing alone, simply need not be accepted. See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. at 151. Similarly, the Court need not accept the uncorroborated testimony of Officers Adams and Baxter that they arrested Mr. Pitt because a superior officer, Lieutenant Lanciano, told them to do so. Moreover, Adams testified that he and Baxter discussed their testimony before the trial, and that he was basing his trial testimony on those conversations at least "to some extent." See Tr. 8/19/03 at 121 (Adams testim.).

Importantly, as plaintiff points out, Detective Bovino was asked when he testified at trial whether a negative identification by the Feldmans would have been communicated to the other police officers on the bridge. Detective Bovino testified that while he didn't recall specifically whether he told Adams and Baxter of the negative identification on the bridge before Mr. Pitt was arrested, "we probably would have – you know, I would have – we would have absolutely done it, you know, communicated on the bridge[,]" Tr. 8/19/03 at 245-46 (Bovino testim.), and that anyone who took part in the discussions on the bridge would have been aware of Mrs. Feldman's negative identification of Mr. Pitt. See Tr. 8/20/03 at 24 (Bovino testim.). In light of this testimony, there is evidence in the record sufficient to draw the reasonable inference in favor of the nonmovant, Mr. Pitt, that Officers Adams and Baxter were aware of the negative identification right after the show-up while they were on the bridge, before they arrested Mr. Pitt. And, as the court of appeals noted:

11

> The defendants have not cited a single case – from any jurisdiction – in which a court held that there was probable cause to arrest or prosecute a suspect notwithstanding a victim's unambiguous negative identification of the suspect. Of course, it is likely that no such cases can be found because few law enforcement agencies would arrest or prosecute a suspect after a victim of the crime has stated without qualification that the suspect was not the perpetrator.

Pitt v. District of Columbia, 491 F.3d at 502-03 (footnote omitted).

Especially in light of the negative identification of Mr. Pitt by the victims of the robbery, the other factors the defendants cite as providing an objectively reasonable basis to believe that their actions in arresting Mr. Pitt were lawful are no more persuasive. Regarding "proximity in time and location" and "use of expected escape route," the Court agrees with plaintiff that these factors are similar to defendants' previous argument that Mr. Pitt was "fleeing." As the Court of Appeals noted, one "cannot conclude that Mr. Pitt's actions were 'consistent with flight.'" Pitt v. District of Columbia, 491 F.3d at 503. Similarly, regarding "possession of instruments of robbery," the court of appeals explained that they "failed to see the relevance of this evidence, given that the victims did not allege that the robber had used a weapon" and because "Mr. Pitt had provided a reasonable explanation for why he had those items[.]" Id.

For all of these reasons, the Court concludes that the actions of Officers Adams and Baxter "in arresting Mr. Pitt 'violate[d] clearly established constitutional rights of which a reasonable person would have known.'" Pitt v. District of Columbia, 491 F.3d at 510 (brackets in original) (quoting Harlow v. Fitzgerald, 457 U.S. at 818). In short, no objectively reasonable police officers in Officers Adams and Baxter's positions could have believed, on these facts, that

there was probable cause to arrest Mr. Pitt; no objectively reasonable officers would have believed their conduct to be lawful in light of clearly established law.

The Court reaches a different conclusion with respect to Detective Bovino. As defendants summarize the facts relating to Detective Bovino's role:

> After plaintiff was stopped on the Taft Bridge, Detective Bovino and other officers went to the bridge, at the request of Lieutenant Lanciano, to assist with the witness show-up identifications. (Exh. B, Tr. 8/19/03 at 233). Detective Bovino was with Mrs. Feldman when she stated that plaintiff "doesn't look like him. I'm quite sure it's not him." (Id. at 243). Detective Bovino accurately recorded Mrs. Feldman's statement in his notes and relayed the statement to his superiors. (Id. at 243, 245-46). He then left the bridge to conduct further investigation at the scene of the robbery. (Id. at 249-50). Detective Bovino did not speak with plaintiff on the bridge and did not see him again until later at the police station, after the arrest. (Id.)

Defs' Supp. at 4. A review of the cited trial transcripts supports this summary of the facts.[4]

Leaving aside the recitation of events that took place after Mr. Pitt was already under arrest, see Pl's Resp. at 11-12, plaintiff's primary argument in support of Detective Bovino's liability for the unlawful arrest of Mr. Pitt is that "Bovino was present at Taft Bridge with Mrs. Feldman where he heard her exoneration of Mr. Pitt. There he communicated this outcome to other police, and it is reasonable to infer that he shared in the decision to arrest Mr. Pitt. The jury was entirely within its rights in finding Det. Bovino liable." Id. at 12. Unlike his

---

[4] The Court notes that while defendants dispute the specific testimony of Detective Bovino – when he said "we probably would have – you know, I would have – we would have absolutely done it, you know, communicated on the bridge." Tr. 8/19/03 at 245-46 (Bovino testim.) – when the *plaintiff* cites to it to support the inference that Officers Adams and Baxter knew of the negative identification before they arrested Mr. Pitt, defendants *themselves* rely on this *exact same testimony* to assert that Det. Bovino "relayed the statement to his superiors." See Defs' Supp. at 4.

...
...

previous assertions, plaintiff's arguments about the pre-arrest facts as they related to Detective Bovino lack any citations to evidence. The only relevant *evidence* in the record is that Detective Bovino heard Mrs. Feldman's negative identification and accurately relayed the fact of it to the other police officers on the bridge. The Court is unable to conclude that there is any evidence in the record from which one could infer that Detective Bovino's actions with respect to the arrest of Mr. Pitt "'violate[d] clearly established constitutional rights of which a reasonable person would have known.'" Pitt v. District of Columbia, 491 F.3d at 510 (brackets in original) (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Accordingly, Detective Bovino is entitled to qualified immunity on this claim.

For the foregoing reasons, the Court affirms its decision (albeit under a different analysis) that Detective Bovino is entitled to qualified immunity, but has revisited and will now rescind its earlier determination that Officers Adams and Baxter are entitled to qualified immunity on plaintiff's claim under Section 1983. As noted above, the actions of Officers Adams and Baxter "in arresting Mr. Pitt 'violate[d] clearly established constitutional rights of which a reasonable person would have known.'" Pitt v. District of Columbia, 491 F.3d at 510 (brackets in original) (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Accordingly, Officers Adams and Baxter are not entitled to qualified immunity on plaintiff's claim under Section 1983.

An Order and Judgment consistent with this Opinion, and implementing the decision of the court of appeals with respect to the other issues presented on appeal, will be issued this same day.

SO ORDERED.

_____/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  June 2, 2008